UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 11-1342

DELORICE BRAGG, as Administratrix of the Estate of; DON
ISRAEL BRAGG; FREDA HATFIELD, as Administratrix of the
Estate of; ELLERY HATFIELD,

Plaintiffs - Appellants,

v.

UNITED STATES OF AMERICA,

Defendant - Appellee.

Appeal from the United States District Court for the Southern
District of West Virginia, at Charleston.  John T. Copenhaver,
Jr., District Judge.  (2:10-cv-00683)

Argued:  May 17, 2012                    Decided:  July 17, 2012

Before AGEE, DAVIS, and WYNN, Circuit Judges.

Unpublished Order of Certification of a question of law to the
West Virginia Supreme Court of Appeals.

**ARGUED:** Bruce E. Stanley, REED SMITH, LLP, Pittsburgh,
Pennsylvania, for Appellants.  Benjamin Seth Kingsley, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.
**ON BRIEF:** Colin E. Wrabley, Alicia M. Schmitt, Lucas Liben, REED
SMITH, LLP, Pittsburgh, Pennsylvania, for Appellants.  Tony
West, Assistant Attorney General, Mark B. Stern, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C.; R. Booth Goodwin II,
United States Attorney, Charleston, West Virginia, for Appellee.

PER CURIAM:

As representatives of the estates of two deceased coal miners, Appellants brought this negligence and wrongful death action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). Appellants alleged that the negligence of the Mine Safety and Health Administration ("MSHA") in its safety inspections of the Aracoma Coal Company's Alma Mine ("Mine") contributed to a fire that resulted in the death of the miners. The district court dismissed the action because, in its view, under West Virginia law, a private person under like circumstances to those alleged against the United States would not be liable in a negligence action for the wrongful death of the miners.

On appeal, Appellants challenge the district court's interpretation of West Virginia's tort law. Finding no controlling appellate decision, constitutional provision or statute of West Virginia resolving the determinative issue in this matter, we certify the following question of law to the West Virginia Supreme Court of Appeals pursuant to the Uniform Certification of Questions of Law Act, W. Va. Code § 51-1A, et. seq.:

> Whether a private party conducting inspections of a mine and mine operator for compliance with mine safety regulations is liable for the wrongful death of a miner resulting from the private party's negligent inspection?

This Court acknowledges that the West Virginia Supreme Court of Appeals may reformulate this question. See W. Va. Code § 51-1A-4. In accordance with the requirement in W. Va. Code § 51-1A-6, we identify the names and addresses of counsel of record and unrepresented parties as follows: (1) Counsel of record for Appellants is Alicia M. Schmitt, Bruce E. Stanley, and Colin E. Wrabley, Reed Smith, LLP, Suite 1200, 225 5th Avenue, Pittsburgh, PA 15222; (2) Counsel of record for Appellee is Benjamin Seth Kingsley, United States Department of Justice, Civil Division, Appellate Staff, Room 7261, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0000; and Charles T. Miller and Fred B. Westfall, Jr., Office of the United States Attorney, Suite 4000, Southern District of West Virginia, 300 Virginia Street, East, P. O. Box 1713, Charleston, WV 25326-1713.

I.

Pursuant to W. Va. Code § 51-1A-4, this "certification order must contain: the facts relevant to the question, showing fully the nature of the controversy out of which the question arose." In complying with this requirement, we note that the district court's dismissal was for want of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and, consequently, "we must assume the truth of the material facts as

3

alleged in the complaint." White v. United States, 53 F.3d 43, 44 (4th Cir. 1995).

On January 19, 2006, an over accumulation of combustible coal dust in the Mine caused a deadly fire. Although attempts were made to extinguish the fire and contain the smoke, these attempts were stymied by inadequate safety measures including, for example: a fire hose rendered useless because "the threads on the fire hose coupling did not match the threads on the outlet"; a lack of water because "the main water valve had been closed at the source, cutting off water to the area where the fire had started"; inadequate ventilation controls and ventilation safety barriers that failed to warn the miners of the danger and allowed smoke to flow "in the wrong direction, deeper into the mine . . . flooding the emergency escapeways"; and the absence of functioning CO detectors, as well as malfunctioning communications equipment, that delayed warning the miners of the danger and delayed evacuation. J.A. 9.

Don Israel Bragg ("Bragg") and Ellery Hatfield ("Hatfield"), together with ten other coal miners, were trapped in the underground blaze and smoke. Due to the faulty ventilation system, smoke from the fire flooded the escape route and reduced visibility. In the dark, the miners had difficulty finding a personnel door that was unmarked. Although the workers attempted to utilize breathing devices called Self-

4

Contained Self-Rescuers to deal with the smoke, they lacked the training necessary to operate these devices. Ultimately, ten coal miners managed to escape from the Mine, but Bragg and Hatfield were killed by carbon monoxide intoxication.

MSHA's investigation of the Mine fire revealed numerous violations of the Mine Safety and Health Act ("Mine Act"), 30 U.S.C. § 801, et. seq., by Aracoma Coal Company ("Aracoma Coal") that contributed to the cause and severity of the fatal fire. MSHA's investigation also revealed the inadequacies of its own previous inspections of the Mine. For example, by late 2005, MSHA inspectors issued 95 citations to Aracoma Coal for safety violations but failed to "identify and cite numerous violations that were in existence, neither did they require the mine operator to take corrective actions." J.A. 13. Likewise, MSHA personnel "failed to follow explicit Agency policy regarding Section 103(i) inspections [i.e., spot inspections]" by failing to "undertake reasonable efforts to detect mine hazards", through a "gross misallocation of inspector resources," and by exhibiting "a lack of initiative to appropriately conduct Section 103(i) inspections." J.A. 14.

Accordingly, MSHA determined that its own inspectors were at fault for failing to identify or rectify many obvious safety violations that contributed to the fire. In relation to training, MSHA concluded that its inspector "assigned to inspect

5

the [Mine] did not determine whether the [atmospheric monitoring system] operator[, who ignored the CO alarms during the fire,] was adequately familiar with his duties and responsibilities, even though this determination was required of and understood by the inspector." J.A. 14. The MSHA investigation also revealed that "[a]n adequate inspection by MSHA [of the atmospheric monitoring system ("AMS")] would have identified the deficiencies with the AMS, including the fact that no alarm unit had been installed." J.A. 14. In relation to the ventilation controls, the MSHA investigation confirmed that its inspectors, "demonstrated a lack of initiative to identify basic violations . . . even though the unmarked doors and missing stoppings were obvious and easily identifiable. . . . [such that] an adequate MSHA investigation . . . would have identified the missing stoppings." J.A. 15. The MSHA investigation also revealed that other contributing factors to the fire including its "inadequate" inspection of the conveyor belts and its "ineffective use of MSHA's enforcement authority" in issuing citations for accumulated coal dust. J.A. 16.

MSHA's internal report speculated that conflicts of interest may have contributed to its inspectors' inadequate and ineffective inspection and enforcement of the Mine's compliance with mine safety regulations:

The internal review team has concluded that mine inspectors neglected to issue citations in some situations in which citations were justified and that mine inspectors on occasion underestimated [Aracoma Coal's] negligence and/or the gravity of the hazardous conditions when violations were cited. . . . The failure to propose more significant civil penalties likely interfered with the deterrent value that civil penalties are designed to have under the Mine Act. . . . *[The internal review team believes that some of the identified deficiencies may have stemmed from the relationship that MSHA developed with Massey Energy Company representatives in early 2001. . . . [U]sing enforcement personnel in this manner to assist the Aracoma Coal Company with its compliance efforts may have created a conflict of interest that, over time, may have affected the level of scrutiny MSHA provided at [the Mine] during subsequent mine inspections.]*

J.A. 17.

In light of its extensive findings of inadequacy and ineffectiveness in its inspections, supervision and enforcement at the Mine, MSHA's internal investigation concluded as follows:

It is the internal review team's conclusion that, in the year before the January 19, 2006, fatal fire at the [Mine], MSHA did not conduct inspections in a manner that permitted us to effectively identify hazardous conditions at the mine, and did not utilize the Mine Act to effectively enforce health and safety standards promulgated to provide miners with the protections afforded by the statute. The Aracoma Coal Company's indifference to health and safety conditions at the [Mine] and MSHA's failure to more effectively enforce the Mine Act allowed significant hazards, many of which otherwise might have been identified and addressed, to continue in existence prior to the fatal fire. The Agency's culpability rests with all persons who directly or indirectly were responsible for administering the Mine Act at the [Mine], from the inspectors who conducted the mine inspections through the headquarters office personnel who ultimately were responsible for overseeing MSHA activities throughout the Nation.

7

J.A. 19-20.

## II.

Appellants, the widows of Bragg and Hatfield, instituted this action on April 28, 2010, invoking the federal district court's jurisdiction pursuant to the FTCA. The FTCA waives the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Under the FTCA, the United States is liable "in the <u>same manner</u> and to the <u>same extent</u> as a <u>private individual</u> under <u>like circumstances</u>." 28 U.S.C. § 2674 (emphasis added); <u>Kerns v. United States</u>, 585 F.3d 187, 194 (4th Cir. 2009) ("An action under the FTCA may only be maintained if the Government would be liable as an individual under the law of the state where the negligent act occurred."); <u>see also</u> <u>United States v. Olson</u>, 546 U.S. 43, 46 (2005) (explaining that the "words 'like circumstances' do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield" (quotation omitted)); <u>Carter v. United States</u>, 982 F.2d 1141, 1144 (7th Cir. 1992) ("The national government is never situated

8

identically to private parties. Our task is to find a fitting analog under private law.").

The district court dismissed Appellants' complaint on the basis that West Virginia law would not hold a private analogue to the MSHA inspectors liable for negligence resulting in the wrongful death of the miners. In doing so, the district court rejected theories of liability based upon: (1) West Virginia's general negligence principles as identified in Aikens v. Debow, 208 W. Va. 486, 541 S.E.2d 576 (2000), because "[i]rrespective of the foreseeability of risk" to the miners that may flow from the MSHA's negligent inspection, J.A. 233, "overriding public policy concerns caution against imposing a legal duty upon the MSHA inspectors," J.A. 233; and (2) West Virginia's "special relationship" theory identified in Aikens because "based upon the relevant West Virginia case law, it does not appear that a private analogue to the MSHA inspectors would be held liable to the decedent miners under a special relationship theory." J.A. 239.

On appeal, Appellants contend that the district court erred in its analysis of both West Virginia's general principles of negligence and its special relationship theory.[*]

---

[*] The district court also rejected a theory of liability based upon West Virginia's "voluntary undertaking" theory. The district court concluded that the West Virginia Supreme Court of
(Continued)

9

Several factors justify certification. We find no clear controlling West Virginia precedent to guide our decision. At this stage of the litigation, there are no disputed fact issues, and the question presented is a pure question of state law, which has not been squarely addressed by the West Virginia Supreme Court of Appeals. In addition, we recognize the importance of allowing the West Virginia Supreme Court of Appeals to decide questions of state law and policy with such far-reaching impact. The question of whether a private party is liable to miners for their negligent safety inspection of a mine and mine operator appears to be a matter of exceptional importance for West Virginia. In short, we are uncertain whether the West Virginia Supreme Court of Appeals would conclude that claims by miners against private parties for negligent safety inspections should be dismissed for failure to state a claim.

Therefore, because no controlling West Virginia appellate decision, constitutional provision, or statute appears to address the precise question presented in this case, and the

_____

Appeals "would not hold a private analogue to the MSHA inspectors liable based on a 'voluntary undertaking' theory of liability." J.A. 231. Appellants, however, have not advanced the "voluntary undertaking" theory on appeal.

answer to the certified question is potentially determinative of this appeal, the question is properly subject to review by the West Virginia Supreme Court of Appeals on certification.

IV.

Accordingly, pursuant to the privilege made available by W. Va. Code § 51-1A-3, we respectfully hereby ORDER: (1) that the question stated above be certified to the West Virginia Supreme Court of Appeals for answer; (2) that the Clerk of this Court forward to the West Virginia Supreme Court of Appeals, under the official seal of this Court, a copy of this Order of Certification, together with the original or copies of the record before this Court to the extent requested by the West Virginia Supreme Court of Appeals; and (3) that the Clerk of this Court fulfill any request for all or part of the record simply upon notification from the Clerk of the West Virginia Supreme Court of Appeals.

<u>QUESTION CERTIFIED</u>