**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1938

EQT PRODUCTION COMPANY,

Plaintiff – Appellee,

v.

MATTHEW D. WENDER, in his official capacity as President of the County Commission of Fayette County, West Virginia; DENISE A. SCALPH, in her official capacity as a Commissioner of the County Commission of Fayette County, West Virginia; JOHN H. LOPEZ, in his official capacity as a Commissioner of the County Commission of Fayette County, West Virginia,

Defendants – Appellants.

---------------------------------------

THE WEST VIRGINIA INDEPENDENT OIL AND GAS ASSOCIATION, INC.; THE WEST VIRGINIA OIL AND NATURAL GAS ASSOCIATION, INC.,

Amici Supporting Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (2:16-cv-00290)

Argued: May 9, 2017                                 Decided: August 30, 2017

Before NIEMEYER, WYNN, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Harris wrote the majority opinion, in which Judge Niemeyer joined. Judge Wynn wrote a dissenting opinion.

———————————

**ARGUED:** Derek Owen Teaney, APPALACHIAN MOUNTAIN ADVOCATES, INC., Lewisburg, West Virginia, for Appellants. Timothy M. Miller, BABST, CALLAND, CLEMENTS & ZOMNIR, P.C., Charleston, West Virginia, for Appellee. **ON BRIEF:** Thomas A. Rist, HUMPHREY & RIST, LLP, Fayetteville, West Virginia, for Appellants. Christopher B. Power, BABST, CALLAND, CLEMENTS & ZOMNIR, P.C., Charleston, West Virginia, for Appellee. Roger G. Hanshaw, BOWLES RICE LLP, Charleston, West Virginia, for Amici Curiae.

———————————

PAMELA HARRIS, Circuit Judge:

EQT Production Company operates multiple oil and natural gas wells in Fayette County, West Virginia. It also operates one injection well, used to dispose of wastewater generated by its extraction wells by "injecting" the fluid underground. Although EQT's injection well is regulated by the state and authorized by a state-issued permit, Fayette County, concerned about potential health effects, sought to bar its operation, passing an ordinance that prohibits the disposal of wastewater anywhere within the County.

The question in this case is whether the County's ordinance is preempted, as EQT argues, by the web of state and federal laws comprehensively regulating oil and gas production and wastewater disposal in West Virginia. Emphasizing the limited power of West Virginia's counties vis-à-vis the state, the district court granted summary judgment to EQT, holding that the County's ban on wastewater disposal is preempted by the state and federal laws under which West Virginia issues injection well permits.

We agree with the district court that the West Virginia legislature, in enacting its complex regulatory program for injection wells, did not leave counties with the authority to nullify permits issued by the state. Accordingly, we hold that this central aspect of the County ordinance is preempted by state law. And because we find related aspects of the ordinance to be preempted as well, we affirm the judgment of the district court in all respects.

3

## I.

## A.

We begin by setting out the complex statutory framework that governs the disposal of wastewater in West Virginia. Under two distinct but overlapping regulatory regimes, the West Virginia legislature has vested in its Department of Environmental Protection ("DEP") the authority to protect the state's water resources against contamination from oil and gas production. Although those two regimes differ in certain respects, they share the overarching purpose of ensuring that wastewater disposal does not affect West Virginia's water sources in a way that could threaten human health or the environment.

First, under the West Virginia Oil and Gas Act, W. Va. Code § 22-6-1 *et seq.*, the DEP is broadly responsible for regulating and permitting oil and gas wells in West Virginia. The Oil and Gas Act gives the DEP authority over the "production, storage and recovery" of oil and gas resources. *Id.* § 22-6-2(c)(12). In exercising that authority, the DEP issues permits for the drilling of conventional oil and gas wells, *id.* § 22-6-6, and monitors wells in operation, *see, e.g.*, W. Va. Code R. § 35-4-11.

The extraction process at conventional wells generates "wastewater" as a byproduct,[1] which may contain dissolved waste materials – including carcinogenic chemicals and heavy metals like arsenic and mercury – that are harmful to human health.

---

[1] Like the district court, we use the term "wastewater" to refer to the "non-fuel fluids" from the extraction process, recognizing that other terms are also used in the record. *See EQT Prod. Co. v. Wender*, 191 F. Supp. 3d 583, 587 (S.D.W. Va. 2016).

The storage and disposal of that wastewater also is regulated under the Oil and Gas Act, which charges the DEP specifically with protecting against water pollution arising from oil and gas production. W. Va. Code § 22-6-7. In order to operate a "disposal well for the injection or reinjection underground of any pollutant" – like EQT's injection well – a separate DEP water-pollution control permit is required. *Id.* § 22-6-7(b)(6). Disposal well permits come with regulatory conditions that protect against the contamination of water sources, including monitoring and testing requirements to ensure against leaks. W. Va. Code R. § 35-4-7. Regulations under the Oil and Gas Act provide that disposal wells also are subject to the permit requirements of "applicable federal and state laws." *Id.* § 35-4-7.2.

Chief among those other "applicable" laws is the West Virginia Water Pollution Control Act, W. Va. Code § 22-11-1 *et seq.*, under which West Virginia has enacted a permit program for underground injection control wells ("UIC wells"). And federal law, too, plays a role: To protect underground sources of drinking water, the federal Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*, establishes national standards for regulating injection wells, with which the states must comply. *See id.* §§ 300h, 300h-1(b). West Virginia's UIC permit program meets those federal standards, *see* W. Va. Code R. § 47-13-1 *et seq.*, and as a result, West Virginia has been granted primary enforcement authority over regulation of UIC wells within the state, *see* 42 U.S.C. § 300h-1(b)(3).

Pursuant to the state Water Pollution Control Act, the DEP has promulgated comprehensive regulations for the UIC permit program, designed to ensure that injection

5

wells will not present a significant risk of harm to the public or to the environment. Underground injection is prohibited if "the presence of [a] contaminant may . . . adversely affect the health of persons," W. Va. Code R. § 47-13-13.1.b, and if "water quality monitoring . . . indicates the movement of any contaminant" into an underground drinking water source, then the DEP must prescribe "corrective action" that may include closure of the well, *id.* § 47-13-13.1.c.

The state Water Pollution Control Act covers a number of different kinds of injection wells, including wells associated with mineral extraction and hazardous materials disposal. *See id.* § 47-13-4. Directly relevant here, "Class 2" UIC wells – like EQT's – dispose of oil and gas wastewater, or fluids "brought to the surface in connection with conventional oil or natural gas production" and "commingled with waste waters." *Id.* § 47-13-4.2.a. Those Class 2 injection wells, as noted above, also are regulated and permitted under the Oil and Gas Act. And the UIC regulations promulgated under the Water Pollution Control Act recognize that overlapping jurisdiction, cross-referencing the Oil and Gas Act as a source of "criteria and standards" for Class 2 UIC wells. *See id.* § 47-13-9. As a result, EQT's Class 2 UIC permit references both Oil and Gas Act regulations and Water Pollution Control Act regulations, and is managed by the two corresponding sections of the DEP – the Office of Oil and Gas and the Division of Water and Waste Management.

In conjunction with this elaborate state permitting scheme, the Water Pollution Control Act – but not the Oil and Gas Act – includes a "savings clause," preserving certain "[e]xisting rights and remedies." W. Va. Code § 22-11-27. The savings clause

clarifies that it is the intent of the Act to provide "additional and cumulative remedies to abate [water] pollution," and that the Act does not estop municipalities – or the state, or private persons – from exercising existing rights "to suppress nuisances or to abate any pollution." *Id.*

**B.**

EQT operates approximately 200 oil and natural gas wells in Fayette County, West Virginia. All are "conventional" wells, meaning that they are drilled vertically into the ground. And all were drilled under the authority of permits issued by the state DEP under the state Oil and Gas Act.

The process by which EQT disposes of the wastewater generated by these wells begins on site, at the wells themselves. During production, wastewater is separated from the fuel product and stored initially in tanks located at each conventional well site. When those short-term storage tanks reach capacity, the wastewater is transferred by truck to EQT's separate UIC well. There, it is injected into a confined, underground formation for permanent disposal. EQT's single UIC well in Fayette County serves as the permanent disposal location for the wastewater from hundreds of conventional wells, both within and outside the county.

The injection of wastewater into EQT's UIC well is separately authorized by the state. Since 1986, EQT has held a permit for a Class 2 UIC well, issued by the DEP under the state UIC permit program. And under the Oil and Gas Act, as part of the process by which EQT applies for conventional well permits, the DEP reviews and approves EQT's plans for disposal of wastewater generated by its wells, with EQT

7

providing the location and permit number for its licensed injection well. *See* W. Va. Code R. § 35-4-5.2.a.4.[2]

Notwithstanding this extensive state regulatory apparatus, the Commissioners of Fayette County – Matthew D. Wender, Denise A. Scalph, and John H. Lopez (collectively, "the County") – became concerned that two UIC wells, operated not by EQT but by a third party, were leaking wastewater into local waterways. And although there was no concern about contamination from EQT's UIC well, the County responded with a blanket ban on all permanent disposal of wastewater within County lines.

On January 12, 2016, the County enacted an "Ordinance Banning the Storage, Disposal, or Use of Oil and Natural Gas Waste in Fayette County, West Virginia" ("Ordinance"). J.A. 27; *see* J.A. 95. Section 1 of the Ordinance broadly prohibits the "storage, treatment, injection, processing or permanent disposal" of wastewater "onto or into the land, air or waters within Fayette County[.]" J.A. 97.[3] And although it seems clear enough that a ban on "injection" and "permanent disposal" of wastewater would cover the operation of UIC wells, the next sentence of Section 1 spells it out: "This

_____

[2] Section 35-4-5.2.a.4 references DEP Form WW-9. *See* West Virginia Department of Environmental Protection, Office of Oil and Gas, *Form WW-9: Fluids/ Cutting Disposal Reclamation Plan* (May 2016) (saved as ECF opinion attachment), *available at* http://www.dep.wv.gov/oil-and-gas/GI/Forms/Documents/WW-9%20-%20Fluids%20Cuttings%20Rec%20Plan%2005-19-2016.pdf.

[3] As noted in the text below, the County amended its Ordinance to address concerns related to its storage provisions. The language quoted here is from the Ordinance as amended.

8

prohibition shall specifically apply to injection wells for the purpose of permanently disposing of natural gas waste and oil waste." *Id.*

The prohibition on in-county disposal of wastewater is buttressed by the Ordinance's treatment of wastewater storage. The list of prohibitions in Section 1, as noted above, includes "storage" as well as "disposal" of wastewater. In response to concerns that the Ordinance would preclude even the temporary storage of wastewater at conventional well sites, the County amended the Ordinance to allow for the "temporary storage, treating or processing" of wastewater at state-permitted extraction sites, *id.*, like EQT's conventional oil and gas wells.[4] But it went on to define "temporary storage" to exclude storage of any wastewater destined for permanent disposal within Fayette County.[5] *Id.*

The Ordinance provides expressly that possession of a state or federal permit is not a defense to enforcement of its prohibitions. J.A. 99. Violators are guilty of a misdemeanor and subject to fines of not less than $1,000 and imprisonment of not more than one year for each offense. *Id.* The Ordinance also provides for civil enforcement, including by way of private citizen suits. J.A. 98.

---

[4] Specifically, Section 1's exception extends to "temporary storage" at extraction wells "regulated by a permit issued pursuant to W. Va. Code § 22-6-6," J.A. 97, a provision of the West Virginia Oil and Gas Act covering vertically-drilled wells like EQT's.

[5] The Ordinance defines "temporary storage" as "local containment of natural gas waste or oil waste which will not be permanently stored or permanently disposed of at any site in Fayette County." J.A. 97.

## C.

On January 13, 2016, immediately after the Ordinance was enacted, EQT sued in federal district court, seeking to enjoin key aspects of the Ordinance as preempted by state and federal law. The district court entered a temporary restraining order and preliminary injunction in favor of EQT, and both parties moved for summary judgment.

EQT argued, first, that the Ordinance's ban on operation of its state-licensed injection well is preempted by West Virginia's UIC permit program; according to EQT, West Virginia's comprehensive permitting scheme does not allow for a county to prohibit the very activity that is licensed by the state. And because West Virginia's UIC permit program is not only enacted pursuant to state law but also mandated by the federal Safe Drinking Water Act, EQT argued, the Ordinance's ban on injection wells is preempted by federal law, as well. As for the Ordinance's restriction on storage of wastewater at conventional wells, EQT contended, that provision is inconsistent with the state's broad regulation of oil and gas production – including the storage of wastewater – under the West Virginia Oil and Gas Act.

The County responded by contesting EQT's standing to bring suit, arguing that EQT did not face a realistic threat of enforcement of the ban on operation of its UIC well and that the Ordinance's storage restrictions were not intended to reach EQT's temporary storage of wastewater at conventional wells. On the merits, the County defended its authority to bar permanent disposal in UIC wells. State law, it argued, authorizes a county commission to abate "anything which the commission determines to be a public nuisance," *see* W. Va. Code § 7-1-3kk, and that authority, preserved by the savings

10

clause of the Water Pollution Control Act, allows the County to identify and prohibit UIC wells as "nuisances." As for the federal Safe Drinking Water Act, the County pointed to a similar savings clause protecting the right of both states and "political subdivision[s]" to enforce regulations "respecting underground injection." 42 U.S.C. § 300h-2(d). Finally, and echoing its position on standing, the County argued that because the Ordinance's storage restriction expressly exempts temporary storage, it imposes no obligations on EQT inconsistent with state law.

The district court granted summary judgment to EQT and permanently enjoined the challenged provisions of the Ordinance. *EQT Prod. Co. v. Wender*, 191 F. Supp. 3d 583 (S.D.W. Va. 2016). As an initial matter, the court held that EQT had established the injury in fact necessary to confer standing. Because there is a "realistic threat" of enforcement of the Ordinance's ban on disposal of wastewater in UIC wells, the court concluded, the impending burden of compliance constitutes an actual injury to EQT. *Id.* at 591–92. And although the Ordinance exempts temporary storage from its prohibition on wastewater storage, the court found, the line between "temporary" and "permanent" storage is ambiguous, and EQT's uncertainty as to whether its on-site storage would be prohibited is enough to confer standing. *Id.* at 593–94.

Turning to the merits, the district court held, first, that the Ordinance's restriction on storage at conventional well sites is preempted by the state Oil and Gas Act. Under West Virginia law, the court explained, counties are "creatures of the state," and possess only the power that is delegated to them by the state constitution or legislature. *Id.* at 595–96. As a result, "local ordinances are inferior in status and subordinate to [state]

11

legislative acts," and "towns and cities are without power to adopt ordinances which might, in any way, interfere with legislative enactment." *Id.* at 596 (alteration in original) (internal quotation marks and citations omitted). And in enacting the Oil and Gas Act, the court determined, the state legislature had reserved to the state, acting through the DEP, complete authority over all aspects of oil and gas production – including the effects of such production on the environment and water sources and, more specifically, storage activity at drilling sites. *Id.* at 598–99. The court recognized, as urged by the County, that § 7-1-3kk of the West Virginia Code delegates to counties the power to "abate . . . anything which the commission determines to be a public nuisance." *Id.* at 595 (quoting W. Va. Code § 7-1-3kk). But given the limited and subordinate authority of counties under state law, the court concluded, and "inconsistencies" between the County's Ordinance and state law "on the same subject," the Ordinance "must yield" to the state scheme. *Id.* at 598–99 (quoting *Davidson v. Shoney's Big Boy Rest.*, 380 S.E.2d 232, 235 (W. Va. 1989)).

Likewise, the court held, the Ordinance's ban on wastewater disposal at UIC wells is preempted by the state's UIC permit program, under both West Virginia's Water Pollution Control Act and the federal Safe Drinking Water Act. If "an activity is sanctioned by the state" – here, the operation of EQT's UIC well, pursuant to a state-issued permit – then "a local governmental entity cannot legislate independently to prohibit or impede that activity." *Id.* at 596 (citing *Brackman's Inc. v. City of Huntington*, 27 S.E.2d 71, 78 (W. Va. 1943)). That basic principle, the court concluded, is not overridden by the savings clause in the state Water Pollution Control Act:

12

Although the savings clause preserves the authority of counties to "suppress nuisances or to abate any pollution," W. Va. Code § 22-11-27, it cannot be read so broadly as to allow a county "unilaterally [to] prohibit conduct that federal and state law both expressly permit." *EQT Prod.*, 191 F. Supp. 3d at 602. Wastewater properly injected into UIC wells pursuant to a state-issued permit "does not become pollution simply because the [County] says so." *Id.* Nor is the Ordinance saved from federal preemption by the savings clause of the federal Safe Drinking Water Act, the court held; that clause preserves the authority of states as well as "political subdivision[s]," and here, it is the state itself that has circumscribed the counties' powers by "undertak[ing] to allow UIC wells." *Id.* at 601.

Accordingly, the district court permanently enjoined the Ordinance's prohibition on wastewater disposal in UIC wells and restriction on wastewater storage at conventional well sites. At EQT's urging, it also enjoined two of the Ordinance's enforcement provisions – those allowing for citizen suits and disallowing a defense based on possession of a permit – as applied to the preempted substantive provisions.

This timely appeal followed.

## II.

On appeal, the County no longer questions EQT's standing to challenge the Ordinance's ban on the operation of its UIC well. But the County continues to argue that EQT lacks Article III standing with respect to the Ordinance's storage restriction, and that the district court's decision to the contrary was in error. We review de novo the

13

district court's legal conclusion that EQT has demonstrated standing, *see White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005), and affirm.

To establish standing under Article III of the U.S. Constitution, a plaintiff – here, EQT – bears the burden of demonstrating that "(1) it has suffered an injury in fact, (2) the injury is fairly traceable to the defendant['s] actions, and (3) it is likely, and not merely speculative, that the injury will be redressed by a favorable decision." *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 231 (4th Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). As the district court explained, it is only the first of these elements, injury in fact, that the County has put at issue here. *See EQT Prod.*, 191 F. Supp. 3d at 590.

Section 1 of the Ordinance prohibits not only "permanent disposal" but also "storage" of wastewater within county boundaries. J.A. 97. According to the County, however, that restriction cannot injure EQT – nor, indeed, affect EQT at all – because EQT stores its wastewater only temporarily at the site of its conventional wells before disposing of it permanently at its UIC well, and the Ordinance expressly exempts from its scope such "temporary storage" of wastewater at state-permitted extraction sites. *Id.* Like the district court, we disagree.

First, as the district court explained, "[i]t is not clear on the face of the Ordinance when 'temporary' storage ends and 'permanent' storage begins," given that "temporary storage" is "defined tautologically as storage that is not permanent." *Id.* at 593; *see* J.A. 97. The County insists otherwise, arguing that it is clear from the record that EQT's on-site storage of wastewater is of short enough duration that it would qualify as

14

"temporary" under the common meaning of the term. But as the district court held, the County's litigation assurances cannot by themselves "alter the uncertainty of EQT's position," and EQT's on-site wastewater storage remains "potentially forbidden by the Ordinance." *EQT Prod.*, 191 F. Supp. 3d at 594. Regardless of the ultimate merits of the parties' dispute regarding the meaning and clarity of the word "temporary," that uncertainty – which would be cured by a holding that the storage restriction is preempted – is enough to make EQT a "proper party to challenge th[e] provision." *Id.*; *see White Tail Park*, 413 F.3d at 460 (standing inquiry "depends not upon the merits . . . but on 'whether the plaintiff is the proper party to bring [the] suit'" (alteration in original) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997))).

Second, and even more fundamentally, the Ordinance by terms excludes EQT from the scope of its "temporary storage" exception. EQT permanently disposes of all of its wastewater in its UIC well in Fayette County. But the Ordinance defines "temporary storage" so that it includes only the storage of wastewater that is *not* intended for permanent disposal at a Fayette County site. J.A. 97. The Ordinance's storage restrictions thus work in tandem with its ban on the use of UIC wells: EQT may neither dispose of its wastewater permanently in its Fayette County UIC well, nor store wastewater at its conventional well sites – for any period of time – if it plans to dispose of that wastewater in its UIC well.

The County stipulated during this litigation that it does "not intend for the Ordinance to apply" to storage at EQT's conventional wells, J.A. 84, but again, the County's litigation position cannot override the plain text of the Ordinance when it comes

15

to establishing a credible threat of enforcement – whether by the County or by the citizen suits the Ordinance authorizes – for purposes of establishing standing. *See EQT Prod.*, 191 F. Supp. 3d at 590–91 (citing, *inter alia*, *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979) (threat of enforcement must be "credible")). In order to assure itself of coverage under the "temporary storage" exception, EQT would be required to shift its permanent wastewater disposal operations out of Fayette County, and it is undisputed that such a change would impose additional costs on EQT. That is enough to give rise to an Article III injury in fact. *See Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1255 (4th Cir. 1995) (finding commercial waste facility suffered injury in fact from state waste management law where facility will "incur costs . . . [to] avoid violation of the provision").

## III.

We turn now to the preemption issues raised by this appeal. We review de novo the district court's award of summary judgment to EQT, viewing the evidence in the light most favorable to the County and drawing all reasonable inferences in the County's favor. *See Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6]

---

[6] Prior to reaching the merits, the district court ruled that certain exhibits to the County's cross-motion for summary judgment – a Declaration of Commissioner Wender and scientific research related to pollution from UIC wells operated not by EQT but by a (Continued)

16

**A.**

Because it is both the core provision of the Ordinance and the primary focus of the parties' arguments on appeal, we begin with the Ordinance's ban on the permanent disposal of wastewater in UIC wells. For the reasons given below, we hold that the County's prohibition on the operation of state-licensed UIC wells is in conflict with the state UIC permit program, and thus preempted under West Virginia's Water Pollution Control Act. As a result, we need not decide the question of federal preemption under the Safe Drinking Water Act. *See Bell Atl. Md., Inc. v. Prince George's Cty.*, 212 F.3d 863, 866 (4th Cir. 2000) (instructing that court should not "decid[e] the constitutional question of [federal] preemption in advance of considering the state law questions").

**1.**

The question posed by the Ordinance's ban on the operation of EQT's UIC well is this: Under West Virginia law, may the County prohibit EQT from engaging in precisely the activity – permanent disposal of wastewater at the UIC well – that has been sanctioned by a state permit, effectively nullifying the license issued by West Virginia's DEP pursuant to state statutory authority? This case does not require us to consider, in

---

different company, Danny E. Webb Construction – were partially inadmissible. We hold that the district court did not abuse its discretion, *see Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015), in finding the exhibits inadmissible "inasmuch as those materials relate to wells operated by Danny Webb[,]" but admitting the exhibits to the extent the materials "explain the scientific aspects of this case," *EQT Prod.*, 191 F. Supp. 3d at 588–89 n.3. Whether the Danny Webb injection wells, in particular, present a public nuisance is not relevant to an assessment of EQT's preemption challenge to the Ordinance.

17

other words, the authority of a county to regulate matters that are only related to or associated with a state-permitted activity. *Cf. Alderson v. City of Huntington*, 52 S.E.2d 243, 246–47 (W. Va. 1949) (county may tax and regulate certain aspects of state-licensed business so long as it does not deny the "right to exercise the privileges conferred upon [the] licensee" (citation omitted)). We need only determine whether a West Virginia county is authorized to take aim at the permitted activity itself, enacting a blanket prohibition on conduct specifically licensed by the state. Under well-established principles of West Virginia law, the answer to that question is no.

The traditional statement regarding the powers of West Virginia localities is this: County commissions are creatures of the State, corporations established by the state legislature; and as a result, they have only the limited powers granted to them by the West Virginia Constitution and legislature, expressly or by necessary implication. *See Butler v. Tucker*, 416 S.E.2d 262, 267 (W. Va. 1992); *see also Davidson*, 380 S.E.2d at 235.[7] It follows, so "fundamental[ly] that citation of authorities is unnecessary," that "municipal ordinances are inferior in status and subordinate to legislative acts[.]" *Davidson*, 380 S.E.2d at 235 (quoting *Vector Co. v. Bd. of Zoning Appeals of City of Martinsburg*, 184 S.E.2d 301, 304 (W. Va. 1971)); *see also, e.g., Am. Tower Corp. v. Common Council of City of Beckley*, 557 S.E.2d 752, 756 (W. Va. 2001). "When a

---

[7] While the status of county commissions and municipalities under West Virginia law differs in some respects, they both possess limited powers vis-à-vis the state, *compare Butler v. Tucker*, 416 S.E.2d 262, 267 (W. Va. 1992) (county commission), *with Davidson v. Shoney's Big Boy Rest.*, 380 S.E.2d 232, 235 (W. Va. 1989) (municipal corporation). Neither party disputes that county and municipal ordinances share the same inferior status relative to state law under West Virginia preemption principles.

provision of a municipal ordinance is inconsistent or in conflict with a statute enacted by the Legislature the statute prevails and the municipal ordinance is of no force and effect." *Davidson*, 380 S.E.2d at 235 (quoting *Vector*, 184 S.E.2d at 301); *see Brackman's Inc.*, 27 S.E.2d at 78 (any "inconsistency" between state and local law "must be resolved in favor of the [s]tate").

The Supreme Court of Appeals of West Virginia has applied these general principles to answer precisely the question we face today. In *Brackman's Inc.*, 27 S.E.2d at 72–73, the court rejected a city's attempt to prohibit a business from selling "non-intoxicating beer" – malt beverage with alcohol content below a prescribed limit – within city boundaries, despite the fact that the business was licensed by the state to do exactly that. Once the state had "acted in the matter" by issuing a license pursuant to a state statute, the court concluded, localities lacked the power to "nullify the [s]tate's action" by "depriv[ing]" the license holder of the "use of such privilege." *Id.* at 78. It would make no sense, the court reasoned, to assume that West Virginia would delegate to its "creature[]" municipalities the power to undo its own permitting scheme: "Did the Legislature ever intend, on the one hand, to grant to a citizen a license to engage in a particular business or occupation, and, with the other, empower its creatures to nullify its action? We think not." *Id.*

*Brackman's Inc.*, and the principles on which it rests, govern this case. West Virginia law simply does not permit a county to ban an activity – here, the permanent disposal of wastewater in Class 2 UIC wells – that is licensed and regulated by the state pursuant to a comprehensive and complex permit program. Instead, to avoid the "serious

19

confusion[] and ofttimes absurd results" that otherwise would follow, the Ordinance, like all local law in West Virginia, is subject to the "implied condition" that where it is inconsistent with state law, it "must yield to the predominant power of the State." *Id.*

**2.**

Against this fundamental principle of state law, the County lays the savings clause of the West Virginia Water Pollution Control Act, which governs state permitting of UIC wells. The savings clause preserves the power of local entities to "suppress nuisances" or "abate any pollution," providing in relevant part that:

> [N]othing herein contained shall abridge or alter rights of action or remedies . . . , nor shall any provisions . . . be construed as estopping the state, municipalities, public health officers, or persons . . . in the exercise of their rights to suppress nuisances or to abate any pollution . . . .

W. Va. Code § 22-11-27. According to the County, its preexisting authority, delegated by state statute, includes the power to "enact ordinances" for the "elimination of hazards to public health" and to "abate . . . anything which the commission determines to be a public nuisance." *Id.* § 7-1-3kk.[8] Because the Water Pollution Control Act preserves its right to "suppress nuisances" and "abate [] pollution," the County asserts, it may designate UIC wells a "nuisance" and then ban them under its § 7-1-3kk authority

---

[8] The relevant portion of § 7-1-3kk provides: "In addition to all other powers and duties now conferred by law upon county commissions, commissions are hereby authorized to enact ordinances, issue orders and take other appropriate and necessary actions for the elimination of hazards to public health and safety and to abate or cause to be abated anything which the commission determines to be a public nuisance."

20

without running afoul of the state's UIC permit program. Like the district court, we disagree.[9]

First, even if the County's broad reading of the savings clause were correct, we question whether that clause alone could resolve the inconsistency between the Ordinance's ban on UIC wells and the state law that governs such wells. That is because, as described above, West Virginia regulates UIC wells not only under its Water Pollution Control Act, which includes a savings clause, but also under its Oil and Gas Act, which does not. *See supra* § I.A. Under the Oil and Gas Act, which separately charges the state DEP with preventing water pollution arising from oil and gas extraction, applicants for conventional well permits must submit for approval their plans for permanently disposing of wastewater. If those plans involve a "disposal well for the injection or reinjection underground of any pollutant," then a separate permit is required. W. Va. Code § 22-6-7(b)(6). The Oil and Gas Act is expressly cross-referenced by the UIC regulations promulgated under the Water Pollution Control Act, and, indeed, EQT's Class 2 UIC permit references regulations under both the Oil and Gas Act and the Water Pollution Control Act, highlighting the degree to which the two regulatory regimes are intertwined. Given the significant regulatory overlap between these two statutory schemes, it is not

---

[9] We do assume for purposes of this opinion, however, that the Ordinance passes the preliminary step of falling within the County's affirmative authority under § 7-1-3kk. EQT argued before the district court that even apart from preemption concerns, the broad reach of the Ordinance exceeds County authority under § 7-1-3kk, and that the County's enactment of the Ordinance is *ultra vires*. The district court dismissed that claim without prejudice, and it is not before us on appeal.

21

clear that a savings clause appearing in one but not the other could authorize an otherwise inconsistent local ordinance.

In any event, and putting to one side the potential preemptive effect of the Oil and Gas Act, we do not believe that the Water Pollution Control Act's savings clause may be given the broad reading urged by the County. According to the County, in enacting the savings clause, West Virginia authorized its counties to prohibit the very same conduct that is specifically sanctioned and permitted by the state, so long as the counties label that conduct a "nuisance." But that is precisely the counter-intuitive intent that the Supreme Court of Appeals of West Virginia refused to ascribe to the state legislature in *Brackman's Inc.*: "It is safe to assume that the Legislature meant to deal fairly with those to whom it granted licenses," and "difficult to believe that it was ever intended" that a locality would be empowered by the legislature to deny the effective use of state-issued permits. 27 S.E.2d at 78. Absent "express" language clearly "vest[ing] in [localities] what may be termed the veto power against the issuance of particular licenses," the court concluded, it would not infer a right to "nullify" state permits – not from a general grant of authority to a locality, and not even from a grant of power covering licensing itself. *Id.*; *see also Davidson*, 380 S.E.2d at 235 (unless state law "plainly and specifically" authorizes inconsistent state and local regulation, it would be "illogical" to assume that result).

Instead, as instructed by West Virginia law, we give the Water Pollution Control Act's savings clause its more logical reading – not as a self-defeating instrument for nullification of state permits, *cf. Brackman's Inc.*, 27 S.E.2d at 78, but as clarification that

22

possession of a state permit will not preclude all local regulation touching on the licensed activity, *see Alderson*, 52 S.E.2d at 247, and, in particular, as preservation of the County's right to bring a common law action for public nuisance against a state-permitted UIC well. That is precisely the reading given the savings clause by the Supreme Court of Appeals of West Virginia in *Taylor v. Culloden Public Service District*, 591 S.E.2d 197 (W. Va. 2003), in which private citizens sought to sue a state-licensed wastewater treatment plant for public nuisance, based on the dumping of raw sewage into water flowing across their land. *Id.* at 200, 202. Although the Water Pollution Control Act does not authorize citizen suits, the court held, the Act's savings clause does, by leaving "intact all existing common law actions for public nuisance" – including citizen suits as well as those of the "public officials" who "ordinarily are [the] proper parties to bring public nuisance actions." *Id.* at 206 (citing *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 354 (W. Va. 1945)). The savings clause thus serves an important function, the court explained: When the state agency "charged with protecting the public's interests" is not quick enough to respond to a potential hazard, it is the "availability of nuisance actions as a remedy" that fills the gap, preventing state inaction from leading to "unabated" risks to health or the environment. *Id.*

Here, of course, the County has taken a different approach. There is no indication in the record that EQT's state-permitted UIC well constitutes a public nuisance as defined by common law, and the County has not sought to bring a common law nuisance action against EQT, nor to codify common law in the Ordinance. Instead, the County has enacted a blanket prohibition on the operation of all UIC wells, on the theory that it is

23

authorized by the savings clause to deem all permanent disposal of wastewater a "nuisance" regardless of common-law standards and even where the effect is to invalidate state-issued licenses. But that pushes the savings clause too far. "[T]he power granted [by the savings clause] is to abate what the law holds to be a nuisance, not to enact that any particular thing is a nuisance." *See Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 626 (W. Va. 1985) (citation omitted). In the future, if the risks that concern the County actually materialize with respect to EQT's UIC well, then the savings clause will allow the County to bring a common law action against EQT for public nuisance. *See Taylor*, 591 S.E.2d at 206. What the County may not do is override the state's licensing decisions by imposing a blanket ban on the operation of properly operating UIC wells within its borders.

For its contrary argument, the County relies chiefly on *Sharon Steel Corporation v. City of Fairmont*, in which the court, relying on a statutory savings clause, upheld a local ordinance banning the improper disposal of hazardous waste against a preemption challenge. 334 S.E.2d at 622. But *Sharon Steel* did not endorse an unlimited grant of power to counties to prohibit state-licensed conduct, as the County suggests. On the contrary: The ordinance at issue in *Sharon Steel* reached only "*improperly* stored" hazardous waste, *id.* at 620 (emphasis added), tying it to common law public-nuisance standards, *id.* at 620–22; and in sustaining the ordinance, the court relied on cases authorizing common law suits for public nuisance, including against state-licensed facilities, *id.* at 623. As in *Taylor*, in other words, what brought the ordinance in *Sharon Steel* within the savings clause was that it effectively enforced or "codif[ied] the common

24

law of nuisance." *Id.* at 625. And the court was careful to limit its holding accordingly, making clear that it does not extend to cases – like this one – involving a "complete[] ban" on a state-sanctioned activity. *Id.* at 624. Indeed, as noted above, *Sharon Steel* expressly *rejects* the position of the County that it may avoid preemption simply by labeling state-permitted conduct a "nuisance": A county has the "power to abate nuisances, not to determine what shall be considered nuisances." *Id.* at 625 (citation omitted); *see also id.* at 626.

Because the Water Pollution Control Act's savings clause does not authorize the County to enact a "complete[] ban," *see id.* at 624, on activity regulated and licensed under the state UIC program, the Ordinance's prohibition on all disposal of wastewater in UIC wells is preempted by state law and "must yield," *see Brackman's Inc.*, 27 S.E.2d at 78.

**B.**

We turn now to the Ordinance's restriction on storage of wastewater at conventional well sites. As described above, Section 1 of the Ordinance prohibits not only "permanent disposal" of wastewater at county UIC wells, but also "storage" of wastewater at conventional well sites. J.A. 97. And the Ordinance's exception for "temporary storage" does not extend to storage – no matter how brief the duration – of any wastewater that ultimately will be disposed of at an in-county UIC well. *Id.* The district court held that this restriction, too, is preempted by state law, and we agree.

Because we have held already that the Ordinance's core prohibition on permanent wastewater disposal is preempted, there is little left to the parties' dispute over the

25

Ordinance's ancillary storage restriction. The point of the storage restriction is to reinforce the underlying ban on in-county UIC wells; that is why it exempts the "temporary storage" of wastewater at conventional drilling sites if and only if that wastewater ultimately is shipped *out* of the county for disposal. The ban on storage pending in-county disposal at UIC wells, in other words, cannot be understood apart from the underlying ban on in-county disposal at UIC wells, and the legal status of the two rise and fall together. *See Sharon Steel*, 334 S.E.2d at 620 (treating combination of restrictions on in-county disposal and storage pending in-county disposal together as single prohibition on disposal).

In any event, we agree with the district court that, considered separately, the Ordinance's restriction is inconsistent with the state Oil and Gas Act and thus preempted.[10] Under the Oil and Gas Act, the legislature has vested in the state DEP the exclusive authority over regulation of the state's oil and gas resources, including in "all matters" related to the "development, production, storage and recovery of this state's oil and gas." W. Va. Code § 22-6-2(c)(12). That authority extends to the regulation of the storage of wastewater at conventional production well sites. And as EQT observes, the

_____

[10] The County argues that the district court improperly used the rubric of "field preemption" in its analysis of this aspect of the Ordinance, after reasoning that the West Virginia courts would apply field preemption doctrine "between state and local governments substantially in the same way it does between the states and the federal government." *EQT Prod.*, 191 F. Supp. 3d at 597. According to the County, the district court erred in finding that the West Virginia courts would extend field preemption doctrine to the state preemption context. We need not resolve this issue of West Virginia law. We agree with EQT that the challenged Ordinance provision is inconsistent with the state Oil and Gas Act, and that is enough to find it preempted under well-established West Virginia law. *See Davidson*, 380 S.E.2d at 235.

Oil and Gas Act and related DEP regulations do not prohibit the storage of wastewater or generally impose temporal limits on such storage at producing well sites. *See id.* § 22-6-30. Nor can the County point to any state law that specifies time limits for the storage of wastewater at producing oil and gas wells.

The County does point to certain provisions of the Oil and Gas Act – requiring operators to remove storage tanks from wells that no longer produce oil or gas, subject to DEP exception for dormant wells, *see id.* §§ 22-6-30(b), 22-6-19; W. Va. Code R. § 35-5-3.1.d – as evidence that the Act contemplates only "temporary" storage of wastewater, and argues that the Ordinance, which also allows for "temporary storage," is therefore consistent. Even if we were to accept the County's characterization of the Act, however, we could not accept its conclusion. First, as EQT argues, the Ordinance's definition of "temporary" – "not [] permanent[]," J.A. 97 – is too imprecise to ensure that the storage permitted under the Ordinance will track the Oil and Gas Act provisions regarding the removal of storage tanks. And second, and more fundamentally, there is the fact that the Ordinance prohibits *all* storage of wastewater at conventional well sites, of whatever duration, if that wastewater ultimately is disposed of at an in-county UIC well. *Id.* The County can cite no parallel limitation on wastewater storage under the Oil and Gas Act, which allows wastewater to be held at well sites without regard to the *county* in which permanent disposal will occur. Indeed, in this respect, the Ordinance's storage restriction is in fundamental conflict with the Oil and Gas Act, under which the state has approved EQT's plans for disposal at its in-county UIC well in the course of permitting EQT's conventional wells.

27

The County also relies, again, on its general authority to abate nuisances under § 7-1-3kk. But unlike the state Water Pollution Control Act, the Oil and Gas Act contains no savings clause that might arguably preserve that authority in the face of an inconsistent state regulatory regime. By restricting wastewater storage at conventional well sites – and doing so based on the intent of a well operator to dispose of wastewater at a county UIC well – the Ordinance creates an inconsistency with the Oil and Gas Act that "must be resolved in favor of the State." *Brackman's Inc.*, 27 S.E.2d at 78.

## C.

Finally, we turn briefly to the County's claim that the district court erred in enjoining two of the Ordinance's enforcement provisions. The first provision allows for enforcement through a private citizen suit, while the second prohibits a defendant's possession of a state or federal permit from being used as a defense to any enforcement proceeding. The district court held that both provisions were "unenforceable" as a result of its preemption analysis of the Ordinance's substantive components. *EQT Prod.*, 191 F. Supp. 3d at 603. The court permanently enjoined the two provisions, but only as related to the "wastewater injection provisions and/or the conventional drilling site" provision. J.A. 198.

We find no error in this ruling. The County contends that the two provisions are not independently preempted by state and federal law – and, indeed, that EQT never argued that they were. But the district court did not hold that the enforcement provisions are independently preempted. Instead, the court determined that they could not be applied to enforce substantive components of the Ordinance – the ban on UIC wells and

28

the restriction on storage – that were themselves preempted and thus unenforceable. We agree with that conclusion, and affirm.

## IV.

For the foregoing reasons, we affirm the judgment of the district court in all respects.

*AFFIRMED*

WYNN, Circuit Judge, dissenting:

As the majority opinion makes plain, the parties' central dispute in this case strikes at the heart of the often-delicate balance between state and federal priorities and the responsibility of local governments to safeguard their communities and protect their citizens. With these weighty matters in mind, and due to the relative paucity of guidance from the West Virginia courts on the question at hand—some of which is in tension with the majority opinion's result—I write separately to express my view that this significant and dispositive question of state law would be best resolved through certification to the Supreme Court of Appeals of West Virginia.

My belief that the present dispute is best resolved through certification principally stems from the decision of the Supreme Court of Appeals of West Virginia in *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616 (W. Va. 1985). *Sharon Steel* involved a ban on the permanent disposal of hazardous waste within the limits of the city of Fairmont, West Virginia. *See* 334 S.E.2d at 618. Like the case at hand, the ordinance was adopted against the backdrop of comprehensive state and federal regimes regulating the storage and disposal of such waste. 334 S.E.2d at 618. And, the relevant state statutes included savings clauses preserving the ability of persons to bring nuisance actions under state law. *Id.* at 622–23.

Affirming the challenged ban, the Supreme Court of Appeals of West Virginia construed the statute narrowly to bar only the *improper* handling of hazardous waste within the city. *See id.* at 620. So construed, the court explained, the ordinance was "directed at abating a public nuisance condition, rather than a regulatory ordinance

30

designed to deal with the management and control over the disposal of hazardous wastes." *Id.* at 622. In light of this distinction, the court found no conflict between the challenged ordinance and the state's broader regulation of hazardous waste. *Id.* In particular, the court emphasized that the savings clauses included in the relevant state statutes ensured that "an ordinance passed by a municipality declaring the permanent disposal of hazardous wastes . . . to be a public nuisance is not pre-empted" under state law. *Id.* at 624.

In the years since *Sharon Steel* was decided, the Supreme Court of Appeals of West Virginia has not had occasion to revisit or clarify its central holding affirming the ability of local governments to prohibit potentially harmful activities within their jurisdictions. Nonetheless, as the majority opinion explains, elements of the *Sharon Steel* Court's analysis suggest that the provision at issue here—unlike the provision the court considered in that case—may be preempted under state law. *See ante* at __.

Absent a controlling appellate decision or other positive state law conclusively resolving this consequential issue, however, I believe the dispositive state-law question raised in this case should be answered by seeking the guidance of the Supreme Court of Appeals of West Virginia pursuant to the state's Uniform Certification of Questions of Law Act, W. Va. Code § 51–1A *et seq.* Doing so would be consistent with our practice of routinely deferring to the Supreme Court of Appeals of West Virginia in resolving unsettled issues of state law in disposing of matters within our jurisdiction. *See, e.g.*, *Schoene v. McElroy Coal Co.*, No. 16–1788, 2017 WL 3037455 (4th Cir. July 18, 2017); *Brickstreet Mut. Ins. Co. v. Zurich Am. Ins. Co.*, No. 16–2204, 2017 WL 2804913 (4th

31

Cir. June 28, 2017); *McNair v. Johnson & Johnson*, No. 15–1806, 2017 WL 2333843 (4th Cir. May 30, 2017); *Dan Ryan Builders, Inc. v. Nelson*, 682 F.3d 327 (4th Cir. 2012), *certified question answered*, 737 S.E.2d 550 (W. Va. 2012); *Bragg v. United States*, 488 F. App'x 672 (4th Cir. 2012), *certified question answered*, 741 S.E.2d 90 (W. Va. 2013).

In keeping with this practice, certification in this case would ensure that we do not adopt a rule with broad implications for environmental regulation in West Virginia—and, perhaps, the balance of state and local authority in the state more generally—based on unsettled precedent. Accordingly, I respectfully dissent from the decision to undertake this analysis without the aid of the body empowered by the citizens of West Virginia to answer this important issue of state law in the first instance.